UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAURA J. RAMOS, ) | |
| ) | |
| UNDER SEAL ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. |
| ) | |
| MERRICK GARLAND, in his official ) | |
| capacity as ) | |
| ATTORNEY GENERAL OF THE ) | |
| UNITED STATES ) | |
| 950 Pennsylvania Avenue, N.W ) | |
| Washington, D.C. 20590, ) | |
| ) | |
| Defendant. ) | |
| ) | |

COMPLAINT
(Employment Discrimination and Retaliation in Violation of Title VII
of the Civil Rights Act of 1964)

Plaintiff Laura Ramos, by her attorney John F. Karl, Jr., sues Merrick Garland, the Attorney General of the United States, in his official capacity and states:

1.  This is an action for Declaratory, Injunctive, Equitable and Monetary Relief for discriminatory and retaliatory actions that were taken against Laura Ramos because she engaged in protected activity in filing prior complaints of discrimination on the basis of gender (sexual harassment), race and national origin against officials with the Federal Bureau of Investigation and of her gender.

1

## I. Jurisdiction and Venue

2. This is an action for violations of Title VII of the Civil Rights Act of 1964 ("Title VII") that arise out of the discrimination and retaliation against plaintiff by officials of the Federal Bureau of Investigation (the FBI). This court has jurisdiction of this action pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343.

3. Venue is proper before this Court pursuant to 28 U.S.C. § 1391(e) because the Defendant's headquarters is within the geographical boundaries of the District of Columbia and because the primary actions complained of either occurred within or were directed within the geographical boundaries of the District of Columbia, and because Ms. Ramos' personnel records are located in the District of Columbia.

## II. Parties

4. Plaintiff Ramos was a female career Special Agent with the FBI. Ms. Ramos has received numerous awards and accolades from the FBI, other intelligence agencies, other law enforcement agencies/departments, DOJ, and private sector partners. These awards include a Special Agent Achievement Award for an Outstanding Job on an International Terrorism Investigation in 2006, two separate "Time Off" Awards for an outstanding job on Counterintelligence Investigations in 2010, and another "Time Off" Award for an outstanding job in Counterintelligence Investigations. Ms. Ramos also received awards for stepping up and serving as the Acting Unit Chief in 2012, and a "Time Off" Award for an outstanding job in Criminal Investigations in 2015. Ms. Ramos has also earned numerous commendations and accolades from various agencies in the US Intelligence Community, as well as from various local law enforcement departments/agencies.

5. Defendant Garland, as Attorney General of the United States, is the senior Executive Branch federal official responsible for the actions of the United States Department of Justice and its subordinate agency, the FBI. The Department of Justice has its principal headquarters located at 950 Pennsylvania Avenue, NW Washington, DC 20530.

### III. Background Facts and History of Protected Activity

6. Ms. Ramos began her career with the FBI in April, 2003. After serving as a GS-13 working out of the San Francisco Division, she was promoted in July 2008, to a position as a Supervisory Special Agent assigned to the FBI's Headquarters Counterintelligence Division. At that time Ramos was promoted from a GS 13 to a GS 14. Ramos was on the right track for a successful career with the FBI.

7. Ms. Ramos began to engage in protected activity more than a decade ago. On or about May 8, 2011, Plaintiff's Acting Unit Chief in Unit 1D, Diana Race, began treating Ramos differently from Race's other subordinates who were not Hispanic. On May 12, 2011, Plaintiff Ramos first contacted an FBI EEO counselor with respect to claims of unlawful racial discrimination by her supervisor. On August 31, 2011, Plaintiff Ramos filed a formal EEO complaint, specifically alleging unlawful discrimination. Plaintiff raised additional issues of ongoing discrimination and maintenance of a hostile work environment based upon race in the course of her EEO counseling. Ms. Ramos continued filing complaints of retaliation and discrimination through 2019 and pursued those complaints with the EEOC.

8. Starting in May 2011, and throughout the summer of 2011, Ramos repeatedly requested that Edward Finnegan, the Assistant Section Chief of the Eurasian Section of the FBI's

Counterintelligence Division, and Douglas Lindquist, the Section Chief of the Eurasian Section of the FBI's stop the harassment.

9. After exhausting her administrative remedies for her first EEO Complaint, Ms. Ramos filed suit in U.S. District Court for the District of Columbia, *Ramos v. Garland*, C.A. No. 13-328, ABJ, where she was represented by Arnold & Porter & Kaye Scholer LLP. The District court dismissed this case, which is currently on appeal to the U.S. Court of Appeals for the District of Columbia Circuit, App. No. 21-5097. Briefing on Ramos' appeal has been stayed pending a decision by the *en banc* Court in *Chambers v. District of Columbia*, App. No. 19-7098. The Court of Appeals heard oral argument in *Chambers* on October 26, 2021.

10. In July, 2014, in an effort to get away from the harassment and hostile work environment, Ramos accepted a down-grade from Grade 14 to Grade 13, the loss of her supervisory position, and reassignment to a position away from Headquarters and became a regular Special Agent in the FBI's Baltimore Field Office.

11. Over the course of Plaintiff's assignment to the Baltimore Division, the pattern and practice of retaliation once again continued unchecked, even though Plaintiff's direct supervisors changed during this time. Plaintiff's previous supervisors informed her Baltimore supervisors about Plaintiff's protected activity and they continued a protracted pattern and practice of retaliation.

12. On April 29, 2016, after she was assigned to the Baltimore field office, Ms. Ramos filed an EEO complaint of hostile work environment-sexual harassment against SSA Stephen Gordon.

13. Ms. Ramos informally resolved this complaint in August, 2016, when the parties agreed to Ramos' reassignment to the Special Operations Group within the Baltimore Division.

14. After the reassignment, Ramos reported to a different supervisor, but the other persons in her chain of command were the same.

15. In mid-September, 2016, the parties were engaged in mediation with a view to resolving Ramos' first lawsuit, but these discussions were not successful. The parties for the federal litigation submitted a status report, advising the court they were unable to settle the lawsuit. *See* Document #65 filed in C.A. No. 13-328 (ABJ) (September 29, 2016).

16. In September, 2016, a few months after she filed and resolved her discrimination complaint, and around the time when Ramos' first lawsuit resumed following the failure of mediation, the FBI's Baltimore Division started an investigation regarding an FBI vehicle accident report that Plaintiff prepared in January 2015. In 2015, at the direction of her then supervisors, Ms. Ramos was assigned to complete an administrative [as opposed to an investigative] bureau accident report of an automobile accident involving a Task Force Officer ("the TFO"), a fellow member of her squad, who was not an FBI employee, with whom Ms. Ramos had a prior relationship. [Ms. Ramos ended the relationship with TFO in 2014.]

17. Ms. Ramos' then supervisor, SSA Steve Grassie, had told Ms. Ramos that the TFO was working at the time of the accident. At no time was Ms. Ramos directed to investigate or make an independent judgment whether the TFO was on duty at the time of the accident; nor did she do so. Instead, she accepted Grassie's representation, which representation is confirmed by SSA Grassie's sworn, signed statements contained in the investigative file of FBI's Office of Professional Responsibility ("OPR").

18. In October, 2016, Gordon Johnson transferred from FBI HQ in the Counterintelligence Division to the FBI Baltimore Division on or about October 2016 as the SAC

5

(Special Agent in Charge). Johnson was aware of Ramos' prior EEO activity and knew that Ramos had filed more than one discrimination complaint because he and Ramos had both been assigned to the Counterintelligence Division at FBI Headquarters where she had filed her original EEO complaint. SAC Johnson attested in a signed sworn statement included in the administrative Report of Investigation that he had heard Ramos had previously filed complaints of discrimination.

19. Contrary to FBI procedures, SAC Johnson deputized one of his friends, Heather Bergey, to conduct the reopened investigation. Ms. Bergey had a clear ulterior motive to support SAC Johnson, as well as her friend SSA Stephen Gordon, against whom Ms. Ramos had filed charges of sexual harassment. The FBI never provided a nonretaliatory reason for violating its own procedures in assigning a friend of the FBI agent whom Ms. Ramos had charged with sexual harassment to investigate the renewed charges and why Bergey exaggerated the charges against Ms. Ramos.

20. On or about December 21, 2016, just a few months after the September, 2016 resolution of Ramos 2016 informal complaint of discrimination, SAC Johnson accused Ms. Ramos of falsifying the automobile accident report involving the TFO and committing time and attendance fraud. Johnson did so at the same time as Ramos' attorneys were conducting depositions for Ramos' case that was pending in U.S. District Court.

21. In response to Johnson's accusations, the Internal Investigations Section within the Inspection Division conducted an investigation.

22. On February 10, 2017, after review of SAC Johnson's accusations, the Internal Investigations Section within the FBI's Inspection Division advised SAC Johnson in a formal Electronic Communication ("EC") sent to the "personal attention" of Johnson that based on the information that they received from Johnson regarding the Ramos' accident report this matter did

6

*not* rise to the level of "misconduct" warranting an administrative inquiry and that they considered the matter closed. Thus, Ramos was again cleared of any charges of wrongdoing in connection with her January, 2015 investigation of the accident.

23. Even though there was no finding of wrong doing by Ms. Ramos, it appears Johnson referred the same charges to FBI's Office of Professional Responsibility ("OPR"). SAC Johnson accused Ms. Ramos of falsifying an accident report and committing time and attendance fraud, which led to an OPR investigation.

24. Despite this finding by the Inspection Division, Plaintiff was notified on March 10, 2017, that she was the subject of an internal investigation to be conducted initially by the Internal Inspections Unit and then by the Office of Professional Responsibility ("OPR"). The investigation charged Plaintiff with "lack of candor under oath" because she allegedly falsified a bureau accident report. The inquiry ultimately expanded into Ramos' alleged conduct occurring in the months preceding January 2015.

25. The FBI initiated and conducted subsequent internal investigation conducted by OPR was in retaliation for Plaintiff's ongoing engagement in protected activity, including but not limited to the maintenance of Ramos' lawsuit then pending in U.S. District Court. There was no legitimate nondiscriminatory, nonretaliatory reason for Johnson's referring charges against Ramos to OPR, as the complaint is filled with inaccurate, false, and misleading accusations against Ms. Ramos.

26. On December 8, 2017, Johnson of the FBI Baltimore Division presented Ramos with a letter from FBI Headquarters, Office of Professional Responsibility, Unit Chief Jessica Loreto, which stated Plaintiff was indefinitely suspended and that the FBI proposed permanently dismissing Plaintiff. The FBI also placed Ramos on a non-duty, non-pay status and indefinite suspension

immediately on receipt of the letter. SAC Johnson then took Plaintiff's badge, credentials, weapon, work phone, and all FBI property Plaintiff had with her.

27. The December 8, 2017 suspension of Ramos occurred 2-business days before the FBI was scheduled to take Ramos' deposition and 1-business day before the deposition of the former Deputy Assistant Director of Intelligence was scheduled to be taken in the first federal lawsuit.

28. The FBI improperly interfered with Ramos' application for unemployment insurance and her request for compensation was denied.

29. On February 6, 2018, OPR held a hearing on these charges. Immediately after the hearing OPR withdrew the most serious charge of "lack of candor under oath" because the FBI admitted there was no evidence to support that charge. OPR's withdrawal of this charge because of a lack of evidence demonstrates that Johnson had no legitimate nonretaliatory or nondiscriminatory reasons for filing the charges with OPR.

30. Ramos was pressured into agreeing to the FBI issued a "Last Chance Adjudication Agreement" in which Plaintiff was required to agree to be suspended for 60 calendar days or face permanent dismissal. Plaintiff ultimately agreed to sign the Last Chance Agreement in an attempt to retain her job. In addition, Plaintiff was required to use all of her available leave in connection with this suspension. The FBI's actions in preventing Ramos from obtaining unemployment insurance added to the financial pressure to accept the Last Chance Agreement.

31. OPR advised Ms. Ramos that OPR was vacating the proposal of dismissal and proposed a 60-day suspension. Although Ms. Ramos had *bona fide* defenses to all of the remaining charges against her, she was anxious [and eager] to return to work. Ramos signed a "Last Chance Agreement" in which

she agreed to a 60-day suspension only because she understood the matter had been concluded. The FBI confirmed in writing that she would return to work on April 3, 2018.

32. Upon information and belief, requiring the Last Chance Agreement was in further retaliation for Plaintiff's engagement in protected activities. The Last Chance Adjudication Agreement would remain in effect for the duration of Plaintiff's tenure with the FBI, subjecting her to "summary removal" for "any other serious misconduct," a term that was left undefined.

33. While she was notified of the theoretical possibility of a referral to the security Division *prior* to the OPR proceedings, the last chance agreement which she signed explicitly stated that "OPR will retain jurisdiction over this matter." Ms. Ramos signed the Last Chance Agreement based on the FBI's explicit promise that she could return to work after she finished her suspension.

34. When SAC Johnson learned that Ms. Ramos would be returning to work after the conclusion of her suspension, he was angry and upset. Johnson demonstrated his discriminatory and retaliatory motives when he announced to Ramos that he was not going to comply with the directive that Ramos return to work "her previous position with full privileges," as required by FBI policy. Johnson told Ramos, in clear violation of FBI policy, that when she returned to work, she would not be returning to her squad and that he had not yet determined the position to which she would be assigned.

35. SAC Johnson's actions in referring Ms. Ramos to the Security Division also violated the long-established FBI policy, which states that: "A subject who receives an initial letter proposing termination that is later amended to something less than termination will be returned to his/her previous position with full privileges, including restoration of any lost salary and routine grade advancements resulting from a non-duty and/or non-pay status."

36. In so doing, Johnson violated FBI policy that required Ramos be returned to her previous position with "full privileges." The FBI treated Ramos differently from similarly situated employees outside of Ramos' protected classes who were allowed to return to their previous positions with "full privileges."

37. Further, Johnson told Ramos that he was going to refer her to the Security Division, the FBI's Office in charge of security clearances. The following day Security Division issued a letter withdrawing Ms. Ramos' "Top Secret" security clearance. After Ramos lost her clearance, the FBI fired Ramos because she needed to retain the clearance as a condition of her employment. Ramos appealed to the U.S. Department of Justice. Despite the passage of more than three years, Ramos' appeal of the withdrawal of her security clearance remains pending at DOJ.

38. Johnson lacked any business reason or any legitimate nonretaliatory or nondiscriminatory reason for Johnson's referring charges against Ramos to OPR, as the complaint is filled with inaccurate, false, and misleading accusations against Ms. Ramos. The events at issue occurred in January, 2015. But the Security Division did not address Ramos security clearances until March, 2018, after the Inspection Division and OPR all agreed there were no genuine or *bona fide* discipline or security clearance issues.

39. Ramos' claims of retaliation arising from the actions of SAC Johnson are clearly justiciable under *Department of the Navy v. Egan*, 484 U.S. 518 (1988), and its progeny. The FBI is liable for a security investigation of Ramos where SAC Johnson "acted with a retaliatory or discriminatory motive in reporting or referring information" that he knew to be false, even though his duties did not include adjudicating security clearances and he was acting in violation of FBI's procedures.

40. The initial investigations into Ms. Ramos 2015 accident report were all conducted by personnel in the Baltimore Division, the Inspection Division, and the Office of Professional Responsibility.  None of persons were part of the Security Division.  None of the additional acts of retaliation at issue in this lawsuit are alleged to have been conducted by or based on decisions of any FBI personnel assigned to the Security Division, or with responsibility for security clearances.  Instead, Johnson's actions in reporting Ramos to the Security Division and procuring the withdrawal of her clearance and the termination of her employment were part of a continuing pattern of discrimination and retaliation against Ms. Ramos.

41. Ramos' claims arising from Johnson's reporting of Ramos are fully consistent with the Court of Appeals decision in *Rattigan v. Holder*, 689 F.3d 764, 768 (D.C. Cir. 2012) ("*Rattigan II*").  Under the law of the Circuit, *Egan* "does not preclude all review of decisions by other FBI employees who merely report security concerns." *Id*. at 771 (rejecting the government's attempt to apply "sweeping immunity from Title VII liability" as this would "frustrate[]" "Congress's purpose in enacting Title VII.")

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

42. Ms. Ramos timely contacted an EEO Counselor and on April 20, 2019, timely filed a formal EEO Complaint in this matter, which was accepted in part by the FBI.  The FBI conducted only a superficial investigation and Ms. Ramos received the Report of Investigation on November 7, 2019.  On December 4, 2019, Ms. Ramos timely exercised her statutory right to appeal to the EEOC after the FBI issued its Final Agency Decision.  Ramos sought to conduct discovery and to have an evidentiary hearing before an EEOC Administrative Judge.

43. Notwithstanding these statutory rights, the EEOC Judge denied Ramos her right to discovery which was necessary to resolve numerous factual disputes. The EEOC Judge unlawfully granted summary judgment in favor of the FBI after denying Ramos' request for discovery.

44. Ramos filed an appeal to the EEOC's Office of Federal Operations ("OFO"), which was denied and then timely sought reconsideration from OFO. On February 2, 2022, OFO denied Ramos' request for reconsideration and advised her she would have to file suit within ninety days from her receipt of the Order from OFO. Ramos has done so.

## COUNT I
### (Retaliation in Violation of Title VII)

45. Plaintiff Ramos repeats and incorporates by reference all of the allegations set forth in ¶¶1 through 44 above.

46. Johnson refused to accept OPR's decision or settled FBI policy that Ramos be returned to her position in the Baltimore Field Office and referred Ramos to the Security Division for retaliatory reasons, because she engaged in years of protected activity.

47 As a direct and proximate result of the Defendant's actions, Ramos was terminated when, as a result of the actions of Johnson and others acting in concert with him, Ramos was referred to the Security Division. As a result of Johnson's actions, Ramos suffered lost income and benefits, as well as emotional distress and embarrassment. Ramos also incurred attorney's fees and other costs in vindicating her rights.

## COUNT II
### (Discrimination in Violation of Title VII)

48. Plaintiff Ramos repeats and incorporates by reference all of the allegations set forth in ¶¶1 through 47 above.

49. Defendant discriminated against Ms. Ramos by treating her differently because of her gender, race and/or her national origin. Johnson refused to accept OPR's decision or settled FBI policy that Ramos be returned to her previous position in the Baltimore Field Office with full privileges and instead Ramos to the Security Division for discriminatory reasons. This was discriminatory because Johnson treated Ramos differently because of her gender, race and/or her national origin in violation of Title VII and the FBI's policies and procedures.

50. As a direct and proximate result of the Defendant's actions, Ramos was terminated when, as a result of the actions of Johnson and others acting in concert with him, Ramos was referred to the Security Division. As a result of Johnson's actions, Ramos suffered lost income and benefits, as well as emotional distress and embarrassment. Ramos also incurred attorney's fees and other costs in vindicating her rights.

## RELIEF REQUESTED

A. Declare the FBI's policies and practices as described above violate the Title VII of the Civil Rights Act of 1964;

B. Enjoin the FBI from engaging in employment practices and procedures that operate to discriminate on the basis of gender, race, national origin, and/or prior protected activity;

C. Reinstate Ramos to her rightful place in the FBI;

D. Order the FBI to correct its records, including the OPR file, and to rescind all negative actions taken against Ramos, including the Last Chance Agreement:

E. Award Ms. Ramos back pay and benefits, including restoration of annual an sick leave;

F. Award Ms. Ramos compensatory damages in the amount of $300,000;

    G.    Award Ms. Ramos costs, expenses, and reasonable attorney's fees; and

    H.    Grant Ms. Ramos such other and further relief as the Court may consider just and proper.

Respectfully submitted,

    /S/ John F. Karl, Jr.
John F. Karl, Jr. #292458
McDonald & Karl
1025 Connecticut Avenue, N.W., Suite 615
Washington, D.C. 20036
(202) 293-3200
jfk@jfklaw.org
Counsel for Plaintiff

**JURY DEMAND**

Plaintiff respectfully requests a jury trial in the above matter.

    /S/ John F. Karl, Jr.
John F. Karl, Jr. #292458