## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAURA J. RAMOS,

        *Plaintiff*,

    v.

MERRICK B. GARLAND,

        *Defendant.*

No. 22-cv-1143 (DLF)

## <u>MEMORANDUM OPINION</u>

Plaintiff Laura J. Ramos, a former Special Agent with the Federal Bureau of Investigation, brings this action under Title VII of the Civil Rights Act of 1964, alleging unlawful retaliation and discrimination related to her suspension, revocation of security clearance, and termination.  *See* Am. Compl., Dkt. 4.  Before the Court are the defendant's Motion to Dismiss for lack of subject-matter jurisdiction and for failure to state a claim, Dkt. 8, and the plaintiff's two Motions for Discovery, Dkts. 20, 22.  For the reasons that follow, the Court will grant the motion to dismiss in part for failure to state a claim, otherwise deny the motion to dismiss, and deny the motions for discovery without prejudice.

## I.     BACKGROUND

### A.  Factual Allegations

Ramos began her employment with the FBI in April 2003.  Am. Compl. ¶ 6.  She alleges that, starting in May of 2011, her unit chief "began treating [her] differently from [the chief's] other subordinates who were not Hispanic."  *Id.* ¶ 7.  After a few months, in the summer of 2011, Ramos filed a formal complaint with the Equal Employment Opportunity Commission (EEOC) and later brought a lawsuit in this Court.  *See Ramos v. Garland*, No. 13-cv-328, Dkt. 1 (D.D.C.

Mar. 13, 2013).  Allegedly to "get away from the harassment and hostile work environment" she faced, Ramos transferred to the Baltimore Field Office.  Am. Compl. ¶ 10.  Once in Baltimore, Ramos allegedly suffered continued retaliation, *id.* ¶ 11, and she filed another EEOC complaint against her new supervisor, Stephen Gordon, *id.* ¶ 12.  The complaint was resolved informally by reassigning Ramos to a different group in Baltimore, which resulted in her reporting to a different supervisor.  *Id.* ¶¶ 13–14.

Following her reassignment within the Baltimore office, in September 2016, the parties in Ramos's 2013 litigation advised the Court that despite their efforts to enter a mediated settlement, their "discussions were not successful."  *Id.* ¶ 15.  Shortly after mediation halted, Ramos alleges, the FBI "started an investigation regarding an FBI vehicle accident report that Plaintiff prepared in January 2015."  *Id.* ¶ 16.  That accident report involved a non-FBI employee who was "a fellow member of [Ramos's] squad . . . with whom Ms. Ramos had a prior relationship."  *Id.* ¶ 16.  Ramos indicated on the accident report that the officer involved "was on duty at the time of the accident," allegedly based on her supervisor's and the officer's supervisor's statements to that effect.  *Id.* ¶ 17.  The next month, Gordon Johnson transferred into the Baltimore office as Special Agent in Charge.  *Id.* ¶ 18.  He allegedly assigned "one of his friends, Heather Bergey, to conduct the reopened investigation."  *Id.* ¶ 19.  Assigning Bergey allegedly violated FBI policy and resulted in Bergey "exaggerat[ing] the charges against . . . Ramos by charging Ramos with 'lack of candor under oath' when there was never any evidence to support that charge."  *Id.*  Johnson accused Ramos in December 2016 of falsifying the accident report and additionally committing time and attendance fraud, *id.* ¶ 20, which led the Internal Investigations Section within the Inspection Division to begin an investigation, *id.* ¶ 21.  The Internal Investigations Section then allegedly told Johnson that the information they received did not constitute misconduct that would warrant an

administrative inquiry and thus, in Ramos's view, "cleared [her] of any charges of wrongdoing." *Id.* ¶ 22.

Johnson nonetheless "referred the same charges to the FBI's Office of Professional Responsibility," allegedly "confecting allegations that Ramos committed time and attendance fraud" and "sen[ding] charges unsupported by evidence to OPR for retaliatory and discriminatory reasons." *Id.* ¶ 23. OPR commenced an investigation, *id.* ¶ 26, and in December 2017, Ramos was notified that she was suspended indefinitely without pay and that the FBI proposed permanently terminating her employment, *id.* ¶ 27. The FBI further allegedly "improperly interfered with Ramos'[s] application for unemployment insurance and [her] request for unemployment compensation was denied." *Id.* ¶ 29. After a 2018 hearing, OPR "withdrew the most serious charge of 'lack of candor under oath' because the FBI recognized and admitted there was no evidence to support that charge." *Id.* ¶ 30. Ramos alleges that she was then "pressured into agreeing" to a "Last Chance Adjudication Agreement" in which she "agree[d] to be suspended for 60 days, *id.* ¶ 31; the FBI then allegedly "confirmed in writing that she would return to work on April 3, 2018," *id.* ¶ 32.

Despite that confirmation and the FBI's alleged "explicit promise that [Ramos] could return to work after she finished her suspension," *id.* ¶ 34, Johnson "violated FBI policy," *id.* ¶ 37, by threatening that he would refuse to allow Ramos to return to her "previous position," *id.* ¶ 36. Johnson stated that he would refer Ramos to the Security Division, which in turn revoked Ramos's clearance. *Id.* ¶ 38. "Because [Ramos] needed to retain the clearance as a condition of her employment," the FBI terminated her. *Id.*

### B.  Procedural History

On April 3, 2018, Ramos filed an EEO complaint "alleging retaliation and reprisal for prior protected EEO activity."  *Id.* ¶ 43.  She sought relief at the EEOC, *see id.*, and after losing summary judgment before an EEOC administrative judge, *id.* ¶ 44, she appealed to the Office of Federal Operations ("OFO"), which affirmed, *id.* ¶ 45.  Ramos also filed a second EEO complaint on April 20, 2019, also alleging "retaliation and reprisal."  *Id.* ¶ 46.  She again lost after appeals to an EEOC administrative judge and the OFO.  *See id.* ¶¶ 46–47.

Ramos then filed a second lawsuit in this Court.  Counts I and III of her amended complaint raise claims of retaliation and discrimination, respectively, in connection with Johnson's referral of Ramos to OPR, the FBI's alleged pressuring of Ramos into accepting the Last Chance Agreement, and the FBI's alleged interference with her application for unemployment benefits.  *See id.* ¶¶ 48–53, 59–64.  Counts II and IV bring claims for retaliation and discrimination, respectively, in connection with Johnson's alleged threat not to return Ramos to her position and decision "[i]nstead . . . [to] refer[] Ramos to the Security Division," ultimately leading to Ramos's termination.  *Id.* ¶ 57; *see id.* ¶¶ 54–58, 65–69.

## II.  LEGAL STANDARD

Rule 12(b)(6) allows a defendant to move to dismiss the complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a

defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). A complaint need not contain "detailed factual allegations," but alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility." *Iqbal*, 556 U.S. at 678 (cleaned up).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (citation omitted). The assumption of truth does not apply, however, to a "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (citation omitted). An "unadorned, the defendant-unlawfully-harmed-me accusation" is not credited; likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Ultimately, "[d]etermining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

When deciding a Rule 12(b)(6) motion, the court may consider only the complaint itself, documents attached to the complaint, documents incorporated by reference in the complaint, and judicially noticeable materials. *EEOC v. Saint Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). A Rule 12(b)(6) dismissal "is a resolution on the merits and is ordinarily prejudicial." *Okusami v. Psychiatric Inst. of Wash., Inc.*, 959 F.2d 1062, 1066 (D.C. Cir. 1992).

## III.    ANALYSIS

### A.    *Department of the Navy v. Egan*

Ramos's Title VII claims related to her security clearance revocation and her subsequent termination (Counts II and IV) will be dismissed under *Department of the Navy v. Egan*, 484 U.S. 518 (1988),[1] while her suspension claims (Counts I and III) will not.

#### *1.    Termination Claims (Counts II and IV)*

In Counts II and IV of the amended complaint, Ramos brings claims for retaliation and discrimination, respectively, in connection with Johnson's "refer[ing] [Ramos] to the Security Division," which resulted in revocation of her security clearance and thus termination of her employment.  Am. Compl. ¶¶ 58, 69.  Ramos alleges that Johnson made this referral for retaliatory and discriminatory reasons, as evidenced by his being "angry and upset" upon "learn[ing] that Ms. Ramos would be returning to work" and his announcement that he was "not going to comply with the directive that Ramos return to work" and instead refer her to the Security Division.  *Id.* ¶ 56.

Ramos's claims, however, are squarely foreclosed by *Egan* and subsequent D.C. Circuit case law.  In *Egan*, the Supreme Court held that the Merit Systems Protection Board could not reconsider security clearance denials because Article II—specifically, the President's "authority to classify and control access to information bearing on national security"—"commit[s] by law"

---

[1] The government repeatedly characterizes its motion to dismiss on *Egan* grounds as one challenging the Court's subject-matter jurisdiction.  *See generally* Mot. to Dismiss.  The government does not cite any direct authority for the proposition that *Egan* goes to the Court's jurisdiction, and indeed, the D.C. Circuit has held precisely the opposite.  *See Palmieri v. United States*, 896 F.3d 579, 585 & n.4 (D.C. Cir. 2018) ("[T]he *Egan* holding does not speak to jurisdiction, [so] we can assume without deciding that it does not bar [certain] counts." (citing *Oryszak v. Sullivan*, 576 F.3d 522, 524–26 (D.C. Cir. 2009))).  However, because the same conclusion follows even applying the standards of a 12(b)(6) motion—that is, by taking all facts alleged within the four corners of the complaint as true—dismissal under *Egan* is still appropriate as to some of Ramos's claims.

security clearance decisions to the Executive Branch.  484 U.S. at 527.  *Egan* applies with equal force to *judicial* review of clearance decisions through Title VII actions; *Egan*'s rationale "preclude[s]" a court "from resolving a discrimination claim based on an adverse employment action resulting from an agency security clearance decision."  *Ryan v. Reno*, 168 F.3d 520, 523 (D.C. Cir. 1999).  Thus, "under *Egan* an adverse employment action based on denial or revocation of a security clearance is not actionable under Title VII."  *Id.* at 524; *see Bennett v. Chertoff*, 425 F.3d 999, 1001 (D.C. Cir. 2005).  This conclusion is "fortified by Title VII's express language exempting employment actions based on security clearance possession."  *Ryan*, 168 F.3d at 524 n.3; *see* 42 U.S.C.§ 2000e-2(g) ("[I]t shall not be an unlawful employment practice for an employer . . . to discharge any individual from any position . . . if (1) the occupancy of such position . . . is subject to any requirement imposed in the interest of the national security of the United States under any security program . . . and (2) such individual has not fulfilled or has ceased to fulfill that requirement.").  Here, Ramos cannot succeed on a Title VII claim challenging her termination because, as alleged, "the FBI fired Ramos because she needed to retain [her security] clearance as a condition of her employment."  Am. Compl. ¶ 38.

The narrow exception that Ramos invokes cannot salvage her termination-related claims. In *Rattigan v. Holder* (*Rattigan II*), 689 F.3d 764 (D.C. Cir. 2012), a case also involving the FBI, the Circuit held that "*Egan*'s absolute bar on judicial review covers only security clearance-related decisions made by trained Security Division personnel and does not preclude all review of decisions by other FBI employees who merely report security concerns."  *Id.* at 768.  For challenges to the acts of non-Security Division employees—that is, those not specifically trained in and charged with making security clearance determinations—a Title VII claim is actionable notwithstanding *Egan* only if the claim is based on "*knowingly false* reporting" of security

concerns. *Id.* at 770. Thus, even for those employees covered by *Rattigan II*, this exception is exceedingly narrow. It includes only "outright lies." *Id.* It does not include the reporting of "doubtful or unreliable information" or any other kind of referral to the Security Division for however discriminatory or retaliatory reasons. *Id.* Indeed, under *Rattigan II*, "the only question is whether the reporting employee actually knew at the time of the reporting that the information he provided was actually false." *Id.*

Ramos's theories for why her allegations satisfy *Rattigan II* are not persuasive. First, Ramos argues that she "satisfies the standard established in *Rattigan* . . . [because] Johnson knew or should have known that that the charges against Ramos, particularly the charge of 'lack of candor under oath' were false." Opp'n at 16, Dkt. 12. At least as to actual knowledge, however— the standard required under *Rattigan II*—allegations supporting that proposition are found nowhere in the complaint. Ramos instead repeatedly pleads only that Johnson and/or the FBI had retaliatory motives, knew of her past protected conduct, and sought to end her employment. *See, e.g.*, Am. Compl. ¶ 18 ("Johnson was aware of Ramos'[s] prior EEO activity and knew that Ramos had filed more than one discrimination complaint . . . ."); *id.* ¶ 26 ("There was no legitimate nondiscriminatory, nonretaliatory business reason for Johnson's referring charges against Ramos to OPR . . . ."); *id.* ¶ 41 ("Johnson's actions in reporting Ramos to the Security Division and procuring the withdrawal of her clearance and the termination of her employment were part of a continuing pattern of discrimination and retaliation against Ms. Ramos."); *id.* ¶ 57 ("Instead, Johnson referred Ramos to the Security Division for retaliatory reasons, because she engaged in protected activity."). To be sure, once in the complaint, Ramos alleges that "[t]he FBI is liable for a security investigation of Ramos where SAC Johnson 'acted with a retaliatory or discriminatory motive in reporting or referring information' that he knew to be false, even though his duties did

not include adjudicating security clearances."   Am. Compl. ¶ 40 (quoting without attribution *Rattigan II*, 689 F.3d at 770).   But the Court need not credit that assertion because it is a thinly veiled recitation of the elements articulated by *Rattigan II*.   *See Iqbal*, 556 U.S. at 678.

Second, Ramos argues that "Johnson also knew that the OPR already determined that a Last Chance Agreement was the appropriate remedy [and] [n]evertheless . . . reported those false charges over to the Security Division."   Opp'n at 16.   The allegations in the complaint related to this argument, however, merely support that Johnson continued raising his concerns—to OPR and then to the Security Division—when other entities determined that termination was unwarranted, not that he *knew* the underlying accusations to be *false*.   *See, e.g.*, Am. Compl. ¶ 22 ("[T]he Internal Investigations Section within the FBI's Inspection Division advised . . . Johnson . . . that based on the information they received from [him] . . . this matter did *not* rise to the level of 'misconduct' warranting an administrative inquiry and that they considered the matter closed.   Thus, Johnson had personal knowledge that Ramos was . . . cleared of any charges of wrongdoing . . . ."); *id.* ¶ 23 ("Even though the Inspection Division found there was no wrongdoing by Ms. Ramos, it appears Johnson referred the same charges to [OPR]."); *id.* ¶ 26 ("[T]he [OPR] complaint is filled with inaccurate, false, and misleading accusations against Ms. Ramos and Ramos had already been exonerated twice."); *id.* ¶ 38 (alleging that after Johnson learned Ramos was only being suspended and would be reinstated, he "told Ramos that he was going to refer her to the Security Division").   Ramos also alleges at one point that Johnson "falsely reported the results of [the] investigations to OPR, and then to the Security Division."   Am. Compl. ¶ 23.   In context and drawing all inferences in favor of the plaintiff, it is clear that Ramos means by this to describe her allegation in the same and preceding paragraphs that Johnson "referred the same charges" to OPR and the Security Division despite the Inspection Division's determination that "the information that they received

from Johnson . . . did *not* rise to the level of 'misconduct' warranting an administrative inquiry" and so "cleared [her] of any charges of wrongdoing."  *Id.* ¶¶ 22–23.  To the extent that Ramos instead means by this allegation that Johnson lied to OPR and the Security Division about the contents of the "formal Elect[r]onic Communication" Johnson received from the Inspection Division, *id.* ¶ 22, any such argument was abandoned by not being raised in Ramos's opposition. *See* Opp'n at 16; *Lewis v. Yellen*, 20-3431, 2022 WL 1446670, at *3 (D.D.C. Mar. 2, 2022) (citing *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 527 (1994)).  Moreover, such an argument would make little sense and not give rise to a plausible claim; no facts in the complaint suggest that such misreporting would have at all contributed to the adverse consequences Ramos alleges, *i.e.*, that the Security Division would have relied on this retaliatory, false characterization of the Inspection Division's determinations instead of the *actual*, easily verifiable results of the administrative investigation.[2]

As to both theories, Ramos at most alleges that the information Johnson conveyed should have appeared to Johnson to be dubious, unsupported by evidence, or insufficiently serious to justify the sanctions he sought.  But such allegations are precisely what the *Rattigan II* court had in mind when it deemed referrals based on "doubtful or unreliable information" insufficient for liability—even if made with retaliatory or discriminatory intent.  *Rattigan II*, 689 F.3d at 770.

---

[2] Similarly abandoned is Ramos's summary statement Johnson also "confect[ed] allegations that Ramos committed time and attendance fraud."  Am. Compl. ¶ 23.  In any event, even assuming that language would be sufficient to clear the bar of *Rattigan II*, Ramos never alleges that those allegations were referred to the Security Division.  *See id.* (stating only that these "led to an OPR investigation").  And Ramos's allegation, also abandoned, that Bergey "exaggerated the charges against . . . Ramos by charging [her] with 'lack of candor under oath' when there was never any evidence to support that charge," *id.* ¶ 19, would also in any event fail because it includes no allegation of a knowingly false statement made by Bergey, or that such a statement was knowingly falsely conveyed to the Security Division.

Ramos's causes of action related to her clearance revocation and termination, Counts II and IV, must therefore be dismissed for failure state a claim under *Egan*.[3]

2.      *Suspension Claims (Counts I and III)*

The Court is unpersuaded that *Egan* supports dismissal of Counts I and III, those relating to Ramos's 60-day suspension, because neither count alleges an "adverse employment action based on the denial or revocation of a security clearance." *Bennett*, 425 F.3d at 1000.

At times, the government appears to suggest that *Egan* supports dismissal of these claims. *See* Mot. to Dismiss at 9 (requesting dismissal of "plaintiff's claims related to her suspension, revocation of her security clearance, and resulting termination" (cleaned up)).  But in substance, the government's arguments relate only to challenges to suspensions *of security clearances*.  *See id.* at 12–13 (citing cases related to interim review of security clearances prior to ultimate revocation).  As alleged, there is no suggestion in the amended complaint that Ramos's 60-day suspension *from employment* was predicated on a suspension of her security clearance.  Indeed, the government argues elsewhere that Ramos's suspension was imposed collaterally to her security clearance review and ultimate termination.  *See id.* at 16 ("Plaintiff was advised . . . that, at the conclusion of the administrative inquiry, Plaintiff's misconduct would be referred to the Security Division for its review and evaluation  of the impact of Plaintiff's conduct upon her ability to maintain a security clearance.").  Because the government has presented no argument for dismissing Counts I and III on *Egan* grounds, the Court will not do so.

---

[3] The Court need not address the government's additional argument that *Rattigan II* does not apply because Ramos's clearance was ultimately revoked.

B.      **Exhaustion**

Counts III and IV, which allege discrimination, also must be dismissed because Ramos failed to "timely exhaust [her] administrative remedies before bringing [her] claims to court." *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (citation omitted); *see also* 42 U.S.C. § 2000e-16(c).  The exhaustion requirement "serves the important purposes of giving the charged party notice of the claim and narrowing the issues for prompt adjudication and decision," *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (cleaned up), and it "ensure[s] that the federal courts are burdened only when reasonably necessary," *Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985).  In the Title VII context, failure to exhaust is an affirmative defense, and thus "the defendant bears the burden of pleading and proving it."  *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997); *see also Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998) ("[A]n affirmative defense may be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint.").

Here, when Ramos filed her charges with the EEOC, she checked the reprisal box but left the discrimination boxes unchecked.  *See* 2018 Compl, Defs.' Ex. 2 at 31–35, Dkt. 8-3; 2019 Compl., Defs.' Ex. 1 at 21–23, Dkt. 8-2.[4]  She also failed to include any factual allegations related to discrimination or assert discriminatory motivation.  *See id.*  A plaintiff who includes in her complaint "allegations outside the ambit of the predicate EEOC charge" fails to exhaust her administrative remedies "as surely as would an initial failure to file a timely EEOC charge." *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) (citation omitted); *see also Haynes v. DC Water Is Life*, 271 F. Supp. 3d 142, 154–56 (D.D.C. 2017) (finding that the plaintiff

---

[4] For purposes of a Rule 12(b)(6) motion, EEO documents are "judicially noticeable public records."  *McIver v. Mattis*, 318 F. Supp. 3d 245, 250 (D.D.C. 2018).

failed to exhaust his race and age discrimination claims where his EEO charge related only to disability discrimination).  Accordingly, the Court will dismiss Count III on this basis.[5]  *See Miles v. Washington Hosp. Ctr. Corp.*, No. 22-cv-287, 2022 WL 2304034, at *3 (D.D.C. June 27, 2022).

C.      **Last Chance Agreement**

The Court will not dismiss the remaining count, Count I, based on the Last Chance Agreement, *see* Mot. to Dismiss at 18–20, because this one-page agreement does not waive Ramos's litigation rights in federal court, *see* Defs.' Ex. 1 at 142 (mentioning waiver only with respect to a "right to appeal to the FBI's internal disciplinary entity"); *compare Snowden v. Zinke*, 506 F. Supp. 3d 18, 30–31 (D.D.C. 2020).  Nor does the agreement contain an express admission of responsibility or disclaimer of retaliation by Ramos.  Instead, it says only that Ramos requested and agreed to the 60-day suspension voluntarily, along with other conditions, in order to resolve the pending disciplinary matter.

It may be, as the government argues in its reply, that, because Ramos's suspension was the product of a voluntary agreement, it cannot be an adverse employment action and is not analogous to a constructive discharge.  *See* Reply at 7–8, Dkt. 18.  But arguments made for the first time in a reply brief need not be considered.  *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008); *Oakes v. Thurgood Marshal Academy Pub. Charter High Sch.*, No. 20-cv-2754, 2022 WL 1556382, at *5 (D.D.C. May 17, 2022).  For the same reasons, the government's argument that *Ramos* conceded the government's points by not adequately addressing them in her opposition, *see* Reply at 8, is unpersuasive.  It is the government that failed to fairly present its arguments in its opening brief.

---

[5] Exhaustion is also an independent ground for the Court's dismissal of Count IV, which the Court has already concluded fails under *Egan*.

13

Accordingly, at least at this stage of the proceedings, the Court will not dismiss Count I of the complaint on these grounds.

**D.     Motions for Discovery**

Finally, the Court will deny Ramos's motions for discovery, *see* Dkts. 20, 22, without prejudice because the Court has relied on only the allegations in the complaint and in the judicially noticeable public record to dismiss Counts II–IV, and this case will now proceed to discovery on the surviving claim.[6]

**CONCLUSION**

For the foregoing reasons, the Court (1) grants the defendant's motion to dismiss as to Counts II, III, and IV, (2) denies the motion as to Count I, and (3) denies the plaintiff's motions for discovery without prejudice. A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

July 14, 2023

---

[6] Moreover, the discovery dispute appears to have arisen because of the government's assertion, which the Court has deemed erroneous, *see supra* note 1, that its argument based on *Department of the Navy v. Egan* relates to subject-matter jurisdiction, which would allow the Court to rely on materials outside the complaint.  Given the Court's conclusion, the discovery dispute no longer appears relevant.